UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| TONYA COFFMAN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:05-cv-199-RLY-JMS |
| | ) | |
| INDIANAPOLIS FIRE DEPARTMENT, | ) | |
| MICKEY RADEZ, CHARLES I. MILLER, | ) | |
| and AL STOVALL, | ) | |
| Defendants. | ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT and
PLAINTIFF'S MOTION FOR RESTRAINING ORDER AND PRELIMINARY
INJUNCTION**

Plaintiff, Tonya Coffman ("Plaintiff"), an employee with the Indianapolis Fire

Department ("IFD"), filed this cause of action against the IFD; Mickey Radez ("Radez"),

Deputy Fire Chief; Alfonso Stovall ("Stovall"), Battalion Commander; and Charles

Miller ("Miller"), Battalion Commander (collectively "Defendants"), alleging gender

discrimination and gender harassment in violation of  Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000 et seq. as amended, ("Title VII"), and disability discrimination in

violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 ("ADA").  Plaintiff

also brings claims under 42 U.S.C. § 1983 ("Section 1983") against Radez, Stovall, and

Miller (collectively "Defendants"), for violating her right to privacy and her procedural

and substantive due process rights.  Finally, Plaintiff brings a retaliation claim under

Indiana law.

1

On January 16, 2007, Defendants filed the instant motion for summary judgment, and on September 24, 2007, Plaintiff filed a motion for restraining order and preliminary injunction.  For the reasons set forth below, the court **GRANTS** Defendants' motion for summary judgment, **DISMISSES** without prejudice Plaintiff's state law retaliation claim, and **DENIES** Plaintiff's motion for preliminary injunction.

I.    **Material Facts**

A.    **Background**

1.    Plaintiff commenced her employment with IFD as a firefighter on April 4, 2001.  (Amended Complaint ¶ 14).

2.    At that time, Plaintiff was certified as a qualified engineer with the State of Indiana to drive IFD's fire vehicles of various types and sizes.  She was also qualified as a paramedic.  (*Id*. ¶¶ 15, 16).

3.    From August 2001 to July 2005, Plaintiff was a substitute firefighter.  (Deposition of Tonya Coffman ("Plaintiff Dep.") at 16).  As such Plaintiff was assigned on a rotating basis to various fire stations throughout IFD.  (Amended Complaint ¶ 17).

4.    Plaintiff is approximately five feet tall "with shoes on."  (Plaintiff Dep. at 30).

B.    **Plaintiff's Driving Evaluations**

5.    In October 2003, Plaintiff worked as a substitute firefighter at Station 10 and drove squad car 10, a Chevy Suburban with an adjustable bench seat.  (Deposition of Montgomery Hoyt ("Hoyt Dep.") at 8-9; Affidavit of Tonya Coffman ("Plaintiff Aff.") ¶ 13).

6.    Lieutenant Montgomery Hoyt ("Hoyt") testified that he was the passenger in squad

car 10 on or about October 18, 2003. (Hoyt Dep. at 9-10).  He testified that

Plaintiff could not reach the pedals, so she moved the bench seat to the closet

possible position to the steering wheel, sat at the edge of the seat, and appeared to

be holding on to the steering wheel for leverage.  He was concerned for her safety

as she was positioned so close to the steering wheel and "square in front of the air

bag."  (*Id*. at 9-10).  Hoyt documented his concerns in an email dated October 18,

2003, to Howard Stahl ("Stahl"), then Division Chief of Health and Safety for IFD,

and Radez.  (Defendants' Ex. 1).

7.    Plaintiff denies that she was assigned to Station 10 on October 18, 2003.

(Plaintiff's Ex. I).  She also alleges that Hoyt never personally observed her drive

squad car 10, and never expressed his concerns to her.  (Plaintiff Aff. ¶ 13).

8.    On November 2, 2003, Carl Lucas ("Lucas"), an IFD firefighter, sent an email to

his supervisor, Miller, expressing his concerns about Plaintiff's ability to drive

squad car 18.  He noted that even though she adjusted the driver's seat as close to

the steering wheel as possible, she still could barely reach the pedals.  This caused

her to have a difficult time seeing out the side mirrors and difficulty backing up the

vehicle.  (Defendants' Ex. 4).

9.    Plaintiff denies ever driving squad car 18 on November 2, 2003.  She states that

she drove for Lucas only a few times in the Summer of 2003.  (Plaintiff Aff. ¶ 14).

10.   Due to the concerns expressed by IFD officers, Stahl conducted a review of

3

Plaintiff's seating position on December 19, 2003.  (Deposition of Howard Stahl ("Stahl Dep.") at 9-10; Defendants' Ex. 5).  As part of the evaluation, Plaintiff drove squad cars 5, 7, and 13.  Because Plaintiff uses her lap and shoulder restraints when she drives, "[Stahl] found no concerns or reasons for not allowing [her] to drive these squads."  (Defendants' Ex. 5).  Stahl nevertheless recommended assigning Plaintiff to Station 29 for further review with Captain Julie Baade ("Baade").  (*Id*.).

11.  On December 23, and 26, 2003, Baade conducted her review by having Plaintiff drive squad car 29 on nine runs.  Overall, Baade thought that Plaintiff "did a good job."  (Defendants' Ex. 6).

12.  On January 25, 2004, Robert Deckard ("Deckard"), an IFD firefighter, expressed concerns about Plaintiff's driving abilities he observed that while a passenger in squad car 29 to his superior officer, Baade.  (Deposition of Robert Deckard ("Deckard Dep.") at 8).  Baade asked him to document his concerns and send the document to Stahl.  (*Id*.).  In accordance with her request, Deckard sent an email to Stahl, stating that he felt unsafe riding with Plaintiff and was concerned with whether she could properly see over the steering wheel while she was driving. (Defendants' Ex. 8).  He also noted that she cut the vehicle early, hit the curb, and allowed the vehicle to drift from side to side without realizing she was moving into other lanes.  (*Id*.).

13.  On March 11, 2004, Plaintiff emailed Baade requesting a meeting with Deckard,

4

Baade, and Baade's boss, Chief Chris Pitts, to confront Deckard about his complaints of January 25, 2004. (Plaintiff's Ex. R). A meeting was held, followed by yet another evaluation of Plaintiff's driving abilities. (*See* Defendants' Ex. 8; Plaintiff's Ex. FF).

14. For unknown reasons, Baade evaluated not only Plaintiff's driving skills, but also her overall work performance. (Defendants' Ex. 8; Plaintiff's Ex. FF). Although there did not appear to be many issues with Plaintiff's driving skills, Baade noted problems with Plaintiff's paramedic skills. For example, she directed Plaintiff not to "put[] bloody items near [her] mouth" and to "ask for help" when needed. (*Id*.). She also advised Plaintiff to "eat with the firefighters, don't isolate yourself," and to "[i]nform your officer about a problem with another firefighter." (*Id*.).

### C. Fitness for Duty Evaluation

15. In April 2004, Emergency Medical Services ("EMS") Duty Officer, Gregory Robinson ("Robinson"), expressed concerns about Plaintiff's mental well-being. (Deposition of Gregory Robinson ("Robinson Dep.") at 9-11). Robinson explained that in his interactions with Plaintiff, he noticed that she spent a lot of time alone, was quiet, reserved, and a bit defensive. (*Id*. at 11). Robinson testified that other firefighters – the names of which he could not remember – observed similar behavior. (*Id*.). Robinson was also mindful of the fact that two fellow firefighters committed suicide in the recent past. (*Id*. at 12-14).

16. In addition, Robinson was concerned about Plaintiff's EMS skills and her ability to

5

administer patient care.  (Defendants' Ex. 9).  He noted her "inability to make decisions or even perform routine tasks on the scene of an incident without being told or prompted."  (*Id*.).

17.   At the request of Miller, Robinson put his concerns in writing.  (*Id*.).

18.   On April 9, 2004, Radez sent out an email expressing to his executive officers that they were responsible for ensuring that their subordinates were capable of performing their respective job duties.  (*See* Defendants' Ex. 11).  He also noted that if an executive officer believed that one of his/her subordinates was having psychological issues, the executive officer should recommend that the subordinate be seen by a professional and/or undergo a fitness for duty evaluation.  (*Id*.).

19.   On that same date, Brian Black, Station Captain at Ladder Company 13 ("Black"), emailed Radez concerning Plaintiff's behavior.  (Defendants' Ex. 10).  In his report, he indicated that Plaintiff was withdrawn, did not communicate well with her fellow co-workers, and was often visited by her husband on her free time.  (*Id*.).  He stated, "it may be in the best interest of everyone concerned that a professional be consulted."  (*Id*.).

20.   Between April 9-12, 2004, Plaintiff's EMS skills were evaluated by Lieutenant Roger Rumple ("Rumple").  Rumple's evaluation is documented in an April 12, 2004, email to Miller.[1]  (*See* Plaintiff's Ex. 12).  Rumple expressed concerns about

---

[1] At that time, Miller was serving in a shift commander's position because the actual commander was on sick leave.  (Miller Dep. at 18).

Plaintiff's EMS skills, particularly her ability to handle patients with back

pain/injuries.  (*Id*.).  Rumple also noted that "Plaintiff spent most of her time in the

women's area or with her husband, an IPD Officer, who would come by and had

little interaction with other people in the firehouse."  (*Id*.).

21.    Based on the information that Miller and Radez received, they recommended

Plaintiff for a fitness for duty evaluation.  (Miller Dep. at 35; Radez Dep. at 95;

Defendants' Exs. 13, 14).

22.    Chief Stovall testified that he had the fundamental responsibility to ensure that IFD

employees were fit and capable of performing their job functions.  (Deposition of

Alfonso Stovall ("Stovall Dep.") at 23).  He therefore agreed with Miller's and

Radez's recommendation.  (*Id*.).  In making his decision to send Plaintiff for a

fitness for duty evaluation, Stovall relied on General Orders 2.04 and 1.49.  (*Id*. at

16-21; Defendants' Exs. 15, 16).

23.    On April 21, 2004, Plaintiff visited the Institute of Public Safety Personnel, Inc.

("IPSP") for a fitness for duty evaluation to be performed by Dr. Deanna Barthlow

("Dr. Barthlow").  (*See* Defendants' Sealed Exhibit 17).  The City of Indianapolis,

Department of Public Safety, has a contract with IPSP to perform such

examinations on IFD personnel.  ("Plaintiff's Ex. OO).

24.    Plaintiff initially refused to sign the release of information form that allows IPSP

to send the report to IFD.  (*Id*. at 2).  Plaintiff later changed her mind, stating that if

she were to refuse to sign the form, it may be viewed as insubordination.  (*Id*.).

25.     Dr. Barthlow observed Coffman's defensive and withdrawn behavior. (*Id.* at 1, 4,

5). At the conclusion of the evaluation, Dr. Barthlow noted that although Plaintiff

was not experiencing any significant or disabling psychological problems, she was

obviously unhappy about some aspect of her worklife. (*Id.* at 4). Dr. Barthlow

recommended that Plaintiff be put on light duty for a period of six weeks and be

referred to an individual therapist for counseling, as she feared Plaintiff's distrust

of the department was being directed toward her. (*Id.* at 5). After six weeks,

Plaintiff was to return for a follow-up evaluation. (*Id.*).

26.     On May 13, 2004, Stovall ordered Plaintiff to go to the Employee Assistance

Program ("EAP") to participate in the program and speak with an individual

therapist, consistent with Dr. Barthlow's recommendations. (*See* Defendants'

Sealed Ex. 18). After completing three sessions, Plaintiff was released and

returned to IPSP for a follow-up evaluation. (*See* Defendants' Sealed Ex. 19).

27.     On June 21, 2004, Plaintiff returned to IPSP and displayed some of the same

behavioral traits as she had in her April 2004 evaluation. (*See* Defendants' Sealed

Ex. 20). Dr. Barthlow's perception was that Plaintiff was making a conscious

effort to be difficult. (*Id.*). Dr. Barthlow also felt that Plaintiff may be at risk for

acting out on the job or during the course of a fire or EMS call. (*Id.*). Based on

these observations, Dr. Barthlow recommended that Plaintiff was not fit for duty.

(*Id.*).

28.     On July 22, 2004, Plaintiff was referred back to IPSP in an effort to return her to

work.  (*See* Defendants' Sealed Ex. 21).  Plaintiff was seen by Dr. Jeffrey Savitsky ("Dr. Savitsky").  Although he observed many of the same traits as Dr. Barthlow, Dr. Savitsky felt that Plaintiff had made progress and appeared to be motivated to comply with department demands.  (*Id*. at 5).  He recommended her not fit for regular duties, but able to return to light duty status for three or four weeks.  (*Id*.).

29.  On September 1, 2004, Plaintiff returned for her follow-up evaluation.  (*See* Defendants' Sealed Ex. 22).  Again, Dr. Savitsky recognized that Plaintiff may have difficulty interacting with department members, but he saw some improvement and recommended her to return to regular duty assignments.  (*Id*. at 4-5).

**D.    Other Fitness for Duty Evaluations**

30.  Other IFD employees, both male and female, have been referred to fitness for duty evaluations in the past four years.  (*See* Defendants' Sealed Ex. 23).  Between December 30, 2003, and September 25, 2003, five male firefighters were referred for fitness for duty evaluations.  (*See* Defendants' Sealed Exs. 23-28).  A female firefighter was referred for a fitness for duty evaluation on June 25, 2001, for illegal drug activity.  (*See* Defendants' Sealed Ex. 29).

**E.    Plaintiff's Request for Public Records**

31.  On December 17, 2003, Plaintiff made a written request for any and all written records pertaining to her from any person within IFD, pursuant to Indiana Code § 5-14-3.  (Plaintiff Dep. at 101; Plaintiff's Ex. C; Defendant's Ex. 32).

32.     On December 23, 2003, IFD denied Plaintiff's request because it believed that the records she requested consisted of intra-agency and interagency advisory and deliberative documents, which the department had the discretion to withhold pursuant to Indiana Code § 5-14-3-4(b)(6).  (Defendants' Ex. 33).

33.     In 2004, Plaintiff spoke to Public Access Counselor, Michael Hurst ("Hurst"). (Plaintiff Dep. at 103-04).  Plaintiff claims that additional verbal requests were made by her union representative, but she made no other written requests.  (*Id*. at 105).

34.     On May 18, 2004, Hurst issued an opinion that Plaintiff was entitled to the documents she requested.  (Defendants' Ex. 34).  In his opinion, Hurst explained to her that she had the option of making another request, filing a formal complaint with the Public Access Office, or filing a complaint in state court.  (*Id*.).

35.     On May 20, 2004, Plaintiff renewed her request for the documents.  (Defendants' Ex. 35).  IFD responded on June 2, 2004, by indicating that they would provide her with the documents which were responsive to her request.  (Defendants' Ex. 36).

36.     On June 25, 2004, Plaintiff received redacted copies of the documents she requested.  (Plaintiff Dep. at 111; Defendants' Ex. 37).

10

**E.      Fitness for Duty Medical Evaluation[2]**

37.      On July 9, 2007, Plaintiff had surgery related to a toe injury and was placed on

light duty status.

38.      On August 7, 2007, Plaintiff's doctor gave her a medical excuse to be off work

from August 7-13, 2004, and referred her to an orthopedic specialist.

39.      On August 8, 2007, Plaintiff provided a copy of her doctor's excuse to IFD official

Captain Mark Harvey ("Harvey") per his directive.

40.      The following day, Harvey directed Plaintiff to report to Dr. Steven Moffatt's

("Dr. Moffatt") office for a fitness for duty medical evaluation and informed

Plaintiff that Stovall had issued the order.

41.      Plaintiff reported to the fitness for duty evaluation on August 10, 2007, but refused

to sign a voluntary medical release form which authorized Dr. Moffatt to release

her medical information to IFD.  Dr. Moffatt therefore declined to perform the

requested medical evaluation of Plaintiff.

42.      On August 13, 2007, Plaintiff was examined by her orthopedic specialist, Dr.

Miller, who extended her absence from work for three weeks for medical reasons.

43.      On August 22, 2007, Stovall communicated an order through Harvey for Plaintiff

to report to Stovall's office at 9:00 a.m. on August 23, 2007.  During that meeting,

---

[2] The facts listed in this section relate to Plaintiff's motion for a preliminary injunction. There are no citations to the record found in Plaintiff's motion, or in Defendants' response. Accordingly, the court presumes that the parties are in agreement as to the material facts listed in this section.

Stovall questioned Plaintiff regarding her refusal to sign the release of medical records authorization on August 10, 2007.

44. On September 17, 2007, Plaintiff's physician found that Plaintiff could return to work.

45. On September 19, 2007, Plaintiff appeared at Dr. Moffatt's office pursuant to Harvey's order that she undergo a fitness for duty medical evaluation.

46. Plaintiff refused to sign the medical release form.

47. Dr. Moffatt notified Harvey and CPT David Harmon.  They appeared at Dr. Moffatt's office and ordered her to sign the medical release form or face discipline.

48. On September 20, 2007, Harvey and Human Resources Manager, Lora Lex, notified Plaintiff she was on "light duty" status indefinitely.

49. On September 24, 2007, Plaintiff underwent her fitness for duty medical evaluation, and was reinstated to full duty.

## II.   Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).   A fact is "material" if it is outcome determinative. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)*.*  A fact is "genuine" where the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Id.*

In determining whether a genuine issue of material fact exists, the court must view the record and all reasonable inferences in the light most favorable to the non-moving party. *National Soffit & Escutcheons, Inc. v. Superior Systems, Inc.*, 98 F.3d 262, 264 (7th Cir. 1996). While the moving party bears the burden of demonstrating the "absence of evidence on an essential element of the non-moving party's case," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), the non-moving party may not simply rest on the pleadings, but "must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial." *Id*. If the non-moving party fails to make a sufficient showing on an issue for which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Ripberger v. Western Ohio Pizza, Inc.*, 908 F.Supp. 614, 617 (S.D. Ind. 1995) (citing *Celotex Corp.*, 477 U.S. at 323).

## III.    Discussion

### A.    Title VII Claims

In Count I of Plaintiff's Amended Complaint, she brings two Title VII claims: a "gender-plus" claim and a gender harassment claim. These claims arise out of the various evaluations she was ordered to undergo. The court will begin its discussion with Plaintiff's "gender plus" claim.

### 1.    "Gender Plus" Discrimination Claim

Plaintiff bases her discrimination claim on a theory of "gender plus" discrimination. In a "gender plus" discrimination case, the plaintiff alleges that the employer discriminated against a subclass within the protected class. *Arnett v. Aspin*, 846

13

F.Supp. 1234, 1238 (E.D. Pa. 1994).

This theory of discrimination was first recognized by the Supreme Court in *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (per curiam). In *Phillips*, the employer had a policy of not accepting job applications from women with school-age children. The Court vacated the Fifth Circuit's grant of summary judgment in favor of the employer, and held that Title VII does not "permit[] one hiring policy for women and another for men." *Phillips*, 400 U.S. at 544. "Unless the condition in question is a 'bona fide occupational qualification' under 42 U.S.C. § 2000e-2(e), [ ], an employer may not 'treat men characterized by [the] additional characteristic more or less favorably than women with the same added characteristic.'" *Marks v. National Communcations Assoc., Inc.*, 72 F.Supp.2d 322 (S.D.N.Y. 1999) (citing *Martinez v. N.B.C., Inc.*, 49 F.Supp.2d 305, 310 (S.D.N.Y. 1999)) (internal citation omitted).

Here, Plaintiff alleges that Defendants ordered her to undergo a driving position evaluation on the basis of a characteristic it would not have considered were she a male: her height. In order to prevail, Plaintiff must establish a prima facie case of discrimination by showing that (1) she is a member of a protected class; (2) she was meeting her employer's legitimate performance expectations; (3) despite adequate job performance, she suffered an adverse employment action; and (4) she was treated less favorably than other similarly situated members outside of the protected group. *Markel v. Board of Regents of the University of Wisconsin Sys.*, 276 F.3d 906, 911 (7th Cir. 2002); *Marks*, 72 F.Supp.2d at 330 (applying prima facie case to plaintiff's "gender plus" claim);

*Arnett* 846 F.Supp. at 1241 (same).

Defendants contend that Plaintiff is unable to satisfy her prima facie case because she has failed to identify a short male firefighter who was treated more favorably than she – i.e., who was not required to undergo a driving position evaluation.  In Plaintiff's Response, she cites to the deposition of Stahl, who stated that IFD "may" have hired male firefighters who are 5'2" or 5'3" tall.  (Stahl Dep. at 11).  To survive summary judgment, Plaintiff must do more than show that IFD "may" have some short firefighters who encountered problems driving a squad car due to their height but were not required to undergo a driving position evaluation, as such evidence is purely speculative.  *See Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) ("[I]f the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her.").  Plaintiff also likens her situation to that of male firefighter, Don Raade, who, because of his obesity, sat very close to the steering wheel of squad car 10. Plaintiff's assertion is without merit, as her claim is a "gender plus height" claim, not a "gender plus weight" claim.

Because Plaintiff is unable to identify any specific male firefighters who are short and were not required to undergo a driving position evaluation, Plaintiff fails to carry her burden of demonstrating a prima facie case of disparate treatment. Her "gender plus" claim therefore fails as a matter of law.

15

### 2.     Gender Harassment

In order to maintain an actionable gender harassment claim, Plaintiff must show that (1) she was subject to unwelcome harassment; (2) the harassment was based upon her gender; (3) the harassment was so severe or pervasive as to alter the conditions of her employment by creating an abusive working environment; and (4) there is a basis for employer liability.  *Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d 1021, 1029 (7th Cir. 2004) (racial harassment claim); *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 462-63 (7th Cir. 2002), *cert. denied*, 537 U.S. 820 (2002) (sexual harassment claim).

The employment actions which comprise this claim include "[t]he serial driving evaluations, paramedic skills evaluations, fire fighter skills evaluations, and referral to psychological fitness for duty evaluations."  (Plaintiff's Response at 22).  Plaintiff argues that these evaluations were "humiliating" and that she did not "deserve" them.   Plaintiff, however, presents no evidence tying the evaluations to her gender.  In fact, she does not even argue the point, apparently relying on the fact that she is female.  But the mere fact that she is female is insufficient to establish the required element that her harassment be *because of* her gender.  *See Williams v. Waste Mgmt. of Ill., Inc.*, 361 F.3d at 1029.  As there is nothing in the record to tie the evaluations to Plaintiff's gender, Plaintiff's gender harassment claim fails as a matter of law.

### B.     ADA Claim

In Count II of Plaintiff's Amended Complaint, Plaintiff brings two ADA claims, both of which are based upon the IFD's decision to refer her to a fitness for duty

psychological examination.

### 1.    The Medical Examination

Plaintiff alleges that the fitness for duty evaluations she was "forced" to undergo were not a result of business necessity, and thus violate Section 12112(d)(4)(A) of the ADA.  That Section provides:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

A medical examination is job-related and consistent with business necessity if an employer reasonably believes that its employee is having mental health issues that may affect his/her job or the safety of the employee and/or the public.  *Davis-Durnil v. Village of Carpentersville*, 128 F.Supp.2d 575, 580 (N.D. Ill. 2001) (citing *Krocha v. City of Chicago*, 203 F.3d 507, 515 (7th Cir. 2001)); *Conroy v. New York Dep't of Correctional Serv.*, 333 F.3d 88, 97-98 (2d Cir. 2003); *see also Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) ("In any case where a [fire] department reasonably perceives an officer to be even mildly paranoid, hostile, or oppositional, a fitness for duty examination is job related and consistent with business necessity.").  Indeed, the Seventh Circuit has held that a police department's decision to require one of its officers to undergo a fitness for duty evaluation after suffering from depression was reasonable and responsible, and thus, did not violate the ADA.  *Krocka*, 203 F.3d at 515.

Plaintiff's position as an employee with the IFD certainly presents safety concerns,

not only for the employees of the IFD, but also for the public at large.  Nevertheless, Plaintiff argues it was not reasonable for Miller, Radez, and Stovall to rely upon the reports of Robinson, Black, and Rumple regarding their opinions of Plaintiff's mental well-being, as these IFD employees did not have sufficient social contact with her to form a reliable, objective opinion.

There is nothing in the record to suggest that the concerns expressed by Robinson, Black, and Rumple were insincere or motivated by an improper purpose.  (*See* Defendants' Exs. 9, 11, and 12).  Thus, it was entirely reasonable for Miller, Radez, and Stovall, as commanding officers, to rely upon the reports of Robinson, Black, and Rumple in making their decision to refer Plaintiff to a fitness for duty psychological examination.  *See Durnil*, 128 F.Supp.2d at 580 (citing *Watson v. City of Miami Beach*, 177 F.3d 932, 935 (11th Cir. 1999) ("The ADA does not, indeed cannot, require a police department to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries.")).  Plaintiff's assertion that Robinson, Black, and Rumple misunderstood Plaintiff's introverted behavior for depression is beside the point.  The fact remains that Miller, Radez, and Stovall were faced with reports which questioned Plaintiff's ability to perform the essential functions of her job with the IFD.  As officers of the IFD are charged with the safety of IFD employees and the public, they were bound to refer Plaintiff for a fitness for duty examination.  Plaintiff's ADA claim therefore fails as a matter of law.

## 2.     IFD's Contractual Relationship with IPSP

Plaintiff alleges that through IFD's contractual relationship with IPSP to perform

fitness for duty medical evaluations, IFD unlawfully obtained Plaintiff's private medical

information.  Plaintiff bases her claim on 29 C.F.R. § 1630.6(a), which states, in relevant

part:

> It is unlawful for a covered entity to participate in a contractual or other
> arrangement or relationship that has the effect of subjecting the covered
> entity's own qualified applicant or employee with a disability to the
> discrimination prohibited by this part.

As noted in Section III.B.1, the IFD was justified in referring Plaintiff to a fitness

for duty psychological evaluation.  In addition, there is no evidence that the Defendants

inquired into matters unrelated to their legitimate interest in determining Plaintiff's

psychological fitness for her position.  *See Thorne v. City of El Segundo*, 726 F.2d 459,

471 (9th Cir. 1983) (holding applicant police officer's right to privacy was violated when

employer required answers to questions about her sex life).  Thus, Plaintiff's claim that

IFD violated the ADA through its contractual relationship with IPSP fails as a matter of

law.

## C.     Constitutional Claims under Section 1983

In Count III of Plaintiff's Amended Complaint, Plaintiff brings three claims under

Section 1983: a claim that the Defendants violated her right to privacy and violated her

procedural and substantive due process rights.

### 1.      Right to Privacy

Plaintiff alleges that "Defendants violated her right to privacy by ordering her to undergo a medical examination, the results of which were, by operation of its contract with IPSP, disseminated to Defendants Stovall and Radez."  (Plaintiff's Response at 26).

In an action based upon 42 U.S.C. § 1983, a plaintiff must show "(1) that 'the conduct complained of was committed by a person acting under color of state law'; and (2) that 'this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States.'"  *Marvin v. King*, 734 F.Supp. 346, 349 (S.D.Ind. 1990) (quoting *Polenz v. Parrott*, 883 F.2d 551, 555 (7th Cir. 1989)).  There is no dispute that Stovall and Radez were acting under color of state law.  Thus, Plaintiff's claim turns on whether the conduct complained of violated her constitutional rights.

The Due Process Clause of the Fourteenth Amendment has been interpreted to include a right of privacy in personal matters, including medical records and communications.  *Denius v. Dunlap*, 209 F.3d 944, 955-56 (7th Cir. 2000).  This "substantial" right in the privacy in one's medical information "can only be overcome by a sufficiently strong state interest."  *Id*.  This balancing test has not been applied in this circuit.  *Id*.  Even so, the court is confident that whatever analysis the Seventh Circuit would employ, it would find that the IFD's interest in employing mentally healthy, effective, and proficient firefighters and paramedics outweighs Plaintiff's right to privacy. As stated above, there is no evidence that the IFD required Plaintiff to answer questions unrelated to her duties as an IFD firefighter/paramedic, nor evidence that the records

20

themselves were disseminated to anyone at IFD who did not possess the specific authority to view them.  Plaintiff was therefore not deprived of her right to privacy in her medical information.  Accordingly, Plaintiff's claim fails as a matter of law.

### 2.   Procedural Due Process Claim

#### a.   Denial of Hearing

Plaintiff alleges that she was not given a hearing or an opportunity to be heard prior to the IFD ordering her for a psychological fitness for duty evaluation.  She alleges a deprivation of her property rights "as she was effectively removed from her job as a fire fighter" when she was placed on light duty and mandatory sick leave.

In order for Plaintiff to establish a procedural due process violation under the Due Process Clause of the Fourteenth Amendment, she must first show that she had a constitutionally protected property interest.  *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 360 (7th Cir. 2005).  Whether Plaintiff had a constitutionally protected property interest in her job is an issue of state law.  *Moulton v. Vigo County*, 150 F.3d 801, 804 (7th Cir. 1998).  "Protected property interests can arise from such state law sources as statutes, contracts, legally binding rules and regulations, or the 'unwritten common law' of employment."  *Id*.  Because Plaintiff was employed in the State of Indiana, the court is bound by Indiana law.  *Id*. (citing *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 943 (7th Cir. 1996)).

In her Response, Plaintiff did not indicate the source of her alleged property right in her employment with the IFD.  Instead, she cursorily argues that public employees,

such as herself, "have a protected property interest in their employment."  In support of

her position, she cites *Kiddy-Brown, supra.  Kiddy-Brown*, however, does not support her

position.  In fact, the Seventh Circuit held that the plaintiff, a warden of an Illinois state

prison, did not have a protected property interest in her job because she was unable to

identify a statutory provision that protected her against termination.  408 F.3d at 360-63.

Like the plaintiff in *Kiddy-Brown*, Plaintiff is unable to indicate any source of state

statutory or contract law that protects her from being referred to a fitness for duty

examination or from being placed on light duty or sick leave without due process.

Without any evidence on that point, Plaintiff's claim must fail as a matter of law.

### b.        Denial of Access to Personnel Records

Plaintiff also alleges that the IFD's denial of Plaintiff's request for access to her

personnel file constitutes a denial of procedural due process.

In order to state a claim, Plaintiff must show that she not only had a

constitutionally protected property interest, but also that she suffered a deprivation

without due process of law.  *Id*. at 360.  Here, there is no argument or evidence

supporting the fact that Plaintiff suffered a deprivation of a constitutionally protected

property interest, in that she ultimately received a favorable response from Public Access

Counselor Hurst approximately five months after her initial request and actually received

the requested personnel records one month later.  The court therefore finds, in the absence

of any additional evidence, that to the extent Plaintiff possessed a constitutionally

protected property interest in her personnel records, Plaintiff did not suffer a deprivation

without due process of law.  Her procedural due process claim therefore fails as a matter of law.

### 3.    Substantive Due Process

Plaintiff alleges that the "Defendants' decision to order Plaintiff to the series of psychological fitness for duty examinations was arbitrary," and thus violated her substantive due process rights under the Fourteenth Amendment.

The Seventh Circuit has set out a two-prong test by which to measure that type of alleged violation: the plaintiff must first allege that the government official's decision was arbitrary and irrational, and either that state remedies are inadequate or that an additional constitutional provision has been violated.  *New Burnham Prairie Homes v. Village of Burnham*, 910 F.2d 1474, 1481 (7th Cir. 1990); *Polenz v. Parrot*, 883 F.2d 551, 558 (7th Cir. 1989); *Kauth v. Hartford Ins. Co. of Illinois*, 852 F.2d 951, 958 (7th Cir. 1988) ("[I]n cases where the plaintiff complains that he has been unreasonably deprived of a state-created property interest, without alleging a violation of some other substantive constitutional right or that the available state remedies are inadequate, the plaintiff has not stated a substantive due process claim.").

Here, Miller, Radez, and Stovall received three reports from IFD firefighters who informed them that Plaintiff was withdrawn and anti-social, and that they were concerned for her well-being.  As previously stated, there is no evidence that these firefighters wrote the reports out of spite or other ill-motive.  Thus, Miller's, Radez's, and Stovall's decision to refer Plaintiff to a psychological fitness for duty evaluation was not arbitrary and

irrational; rather, it was appropriate under the circumstances.  Plaintiff's substantive due process claim also fails for the reason that Plaintiff did not identify an inadequate state remedy or an independent constitutional violation.  Accordingly, Plaintiff's substantive due process claim fails as a matter of law.

>    **D.    Retaliation Claim**

In Count IV of Plaintiff's Amended Complaint, Plaintiff brings a state law claim for retaliation.  In particular, she alleges that the driving position evaluations, EMS skills review, and fitness for duty evaluations were required by the IFD in retaliation for her request to access her personnel file pursuant to the Indiana Access to Public Records Law.  The rationale she uses to support this contention is based upon the *Frampton* doctrine.  *See Frampton v. Central Indiana Gas Co.*, 297 N.E.2d 425 (Ind. 1973).

In *Frampton,* the Indiana Supreme Court enunciated a public policy exception to the employment at-will doctrine by holding that an employee terminated for filing a claim under the Worker's Compensation Act could sue his employer for unlawful retaliation. The Court reasoned that without a common law right of action, employers could avoid all obligations under the Act -- which provided no statutory remedy for retaliation -- by threatening to discharge employees who file claims.

Here, Plaintiff acknowledges that her case does not fit squarely into the *Frampton* framework.  She argues, however, that like the plaintiff in *Frampton*, she had a right to view her personnel records under the Indiana Access to Public Records Act, and that the IFD's decision denying her the same violates the public policy of the State of Indiana.

This claim is Plaintiff's sole remaining claim.  As such, before ruling, the court must decide whether to exercise supplemental jurisdiction over her claim.  *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

28 U.S.C. § 1367(e) provides that a district court may decline to exercise supplemental jurisdiction if "(1) the claim raises a novel or complex issue of State law"; or "(2) the district court has dismissed all claims over which it has original jurisdiction." The court finds Plaintiff's final claim for relief presents a novel issue of state law, as no Indiana court has ever had occasion to rule on a claim based upon the Indiana Access to Public Records Law.  Moreover, all of her federal claims have been dismissed.  Thus, the original basis for the court's jurisdiction no longer exists.  Given this procedural posture, the court declines to exercise supplemental jurisdiction over her claim, and **DISMISSES** her state law retaliation claim without prejudice.  *See Groce*, 193 F.3d at 501 ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial.").

### E.    Preliminary Injunction

Plaintiff asks the court to issue a preliminary injunction:

prohibiting Defendant, Al Stovall, from future contact with Plaintiff and to prohibit Defendant Al Stovall from initiating, recommending, or participating in any investigation or disciplinary proceeding against Plaintiff without prior approval from the Court until such time as the case has been adjudicated.  Additionally, Plaintiff moves the Court [to] prohibit Defendant IFD, its officials, agents, medical or mental health staff from ordering or otherwise requiring Plaintiff [to] undergo a fitness for duty

medical or mental evaluation and/or administering such evaluations and/or requiring Plaintiff to sign any medical release forms related to such evaluations.

(Plaintiff's Motion at 1).

In order to prevail on Plaintiff's motion for preliminary injunction, Plaintiff must demonstrate:  (1) some likelihood of success on the merits; (2) irreparable harm if the injunction is not issued; and (3) no adequate remedy at law.  *Ty, Inc. v. The Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).  If this showing is made, the court must then balance the harm to the moving party if the injunction is denied against the harm to the nonmoving party if the injunction is granted.  *Id.*

### 1.    Likelihood of Success on the Merits

Plaintiff contends that Stovall's order that Plaintiff attend a medical examination on September 19, 2007, two days after she was cleared by her own doctor to return to work, violated the ADA because it was not consistent with business necessity.  Stovall ordered the medical examination pursuant to IFD General Order 2.04.

General Order No. 2.04[3] requires that a firefighter report to a fitness for duty

---

[3]  B.    Returning to Duty After Sick Leave
3.    When returning to duty for any occurrence of more than ten consecutive days, firefighters must bring [a] medical release to duty [sic] directly to the Personnel office.  At that time, a fitness for duty evaluation will be scheduled with the department physician. . .
C.    Miscellaneous
When firefighters are returning to duty from sick leave of any duration, the superior officer has the discretionary authority to deny the return to duty if it is believed that the firefighter's condition may adversely affect the performance or presents a health or safety issue to the Department.

evaluation in cases such as this where a firefighter has been off on medical leave for more than ten consecutive days.  This policy is to protect the safety of the public by ensuring that firefighters are able to meet the physical requirements of the job after they have been on extended medical leave.  The IFD has a legitimate business interest in ensuring that its firefighters and paramedics are mentally and physically fit prior to running into a burning building or responding to any number of life or death emergencies.  (*See* Section III.B.1 of this Entry).  Thus, the IFD's requirement that Plaintiff undergo a fitness for duty medical examination prior to her returning to work was reasonable and consistent with business necessity.  For this reason, the court finds Plaintiff does not have a reasonable likelihood of success on the merits of her ADA claim.

Plaintiff also complains that Stovall retaliated against her for refusing to sign the medical records authorization pursuant to her August 17, 2007, fitness for duty medical evaluation.  Plaintiff fails to support this claim with argument or legal support.  To the extent Plaintiff's retaliation claim is based upon her allegation that Stovall "threatened her with discipline," her claim is without merit as there is no evidence that she was actually disciplined for the same.  To the extent Plaintiff's retaliation claim is based upon the fact that Stovall ordered her to attend the September 19, 2007, fitness for duty examination prior to returning her to work, her claim is without merit for the reasons set forth in the preceding paragraph.

Finally, Plaintiff complains that Stovall's interrogation of her on August 23, 2007, constitutes a breach of the attorney-client privilege.  Again, she neglects to argue this

claim with legal support.  In any event, there was no breach of the attorney-client

privilege, as the Indiana Rules of Professional Conduct do not preclude a represented

client (Plaintiff") from communicating with a represented non-client (Stovall).  *Jones v.

Scientific Colors, Inc.*, 201 F.Supp.2d 820, 829 (N.D. Ill. 2001) ("Thus, while neither a

lawyer nor a lawyer's investigator or other agent may contact the represented client, the

same bar does not extend to the client of the lawyer . . .").

### 2.     Irreparable Harm

Plaintiff's motion for preliminary injunction must also be denied for the reason

that Plaintiff is unable to show that she will suffer irreparable injury if the injunction is

not granted.  Plaintiff was reinstated to full duty and is currently working for the IFD.

The likelihood that she will take sick leave for more than ten consecutive days triggering

the General Order or be required to undergo a psychological examination prior to the

adjudication of this case is highly unlikely and speculative.

### 3.     Conclusion

Because Plaintiff is unable to show a likelihood of success on the merits of her

claims or that she will be irreparably injured if an injunction is not granted, Plaintiff's

motion for preliminary injunction must be **DENIED**.


### IV.     Conclusion

For the reasons set forth in the Entry above, the court **GRANTS** Defendants'

Motion for Summary Judgment (Docket # 60), **DISMISSES** without prejudice Plaintiff's

novel state law claim, and **DENIES** Plaintiff's Motion for Restraining Order and

Preliminary Injunction (Docket # 87).

**SO ORDERED** this <u>15th</u> day of January 2008.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Scott C. Hollingsworth
OFFICE OF CORPORATION COUNSEL
sholling@indygov.org

James B. Osborn
OFFICE OF CORPORATION COUNSEL
josborn@indygov.org

Tae K. Sture
STURE LEGAL SERVICES LLC
tsture99@yahoo.com